THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLAUDE SMITH, JR., Defendant-Appellant.

First District (4th Division)    No. 77-990

Opinion filed September 27, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Francis X. Speh, Jr., and Paul D. Kerpan, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Claude Smith, Jr., was found guilty of two counts of voluntary manslaughter (Ill. Rev. Stat. 1975, ch. 38, par. 9—2). He was sentenced to a term of 2½ to 10 years imprisonment. On appeal, defendant contends the two killings were justified because the deadly force he used was necessary to prevent the commission of a robbery, a forcible felony. Ill. Rev. Stat. 1975, ch. 38, pars. 2—8, 7—3, 18—1.

We affirm the trial court.

Georgette Rosemoore was called as a witness for the State. Rosemoore testified that on December 6, 1974, at approximately 12 p.m., Veda Jefferson, Derrick Simmons and Anthony Richardson drove her and her three-month-old baby to a medical clinic. This group left the clinic sometime after 3 p.m. As they drove south on Stony Island Avenue, they met Rosemoore's cousin, Sharon Hawkins. Hawkins was a passenger in a Cadillac automobile along with Gerald Haynes, Ronald Jackson, Paul Wright and Robert O'Neal.

Both groups decided to have a party. They drove to 88th Street and Stony Island Avenue and double parked in front of Claude's Playgirl Lounge, the defendant's place of business.

Haynes and Jackson entered the lounge. Three minutes later, Simmons and Richardson followed them in. Hawkins and O'Neal waited in the Cadillac while Wright and Jefferson, who was holding Rosemoore's baby, sat in the other car. Rosemoore walked over to the "Chicken Shack," located next door to the lounge, to buy some food.

As Rosemoore came out of the Chicken Shack, she noticed that Haynes, Jackson, Simmons and Richardson had returned from the

lounge. Haynes was sitting in the Cadillac with O'Neal and Hawkins, while Richardson stood near the passenger window. Jackson and Simmons were standing near the other car.

Rosemoore began walking toward the two cars when the defendant ran out of the lounge brandishing a gun. Defendant hollered, "I am going to kill all you mother fuckers out here." The defendant then fired at the Cadillac. Richardson fell to the ground screaming, "I'm hit, I'm hurt." Jackson and Simmons dragged Richardson out of the defendant's line of fire.

Rosemoore told the defendant to stop shooting because her baby was nearby. The defendant responded, "[W]ell, if you are with them, I will kill you too." Whereupon, the defendant fired at her. As the defendant turned toward Jefferson, who was holding Rosemoore's baby, Jackson hollered, "No, shoot me." The defendant fired at Jackson.

When the defendant's gun ran out of bullets, he asked a man standing nearby for his gun. The man handed the defendant another revolver. The defendant walked into the street, stood in front of the Cadillac and fired one shot through the windshield. He then walked around to the driver's door, opened it, leaned inside and fired four shots.

Hawkins, who was sitting in the rear seat of the Cadillac, died from a bullet wound in the back. O'Neal, who was sitting in the front seat, died from a bullet wound in the side.

During the entire episode, Rosemoore did not see anyone else with a gun, nor did she hear anyone else fire a gun. Aside from the two guns fired by the defendant, the police found no other weapons in the vicinity of the lounge.

On cross-examination, Rosemoore testified that when the defendant finished firing the second gun, the Cadillac pulled away; "Bobby O'Neal had slumped over the steering wheel and the car just started rolling." At that time, several police officers arrived on the scene. Two of the officers drove off after the Cadillac, while the others ordered the defendant to drop his gun. The defendant fell to his knees pleading, "[P]lease don't shoot me * * * they tried to rob me."

James Doyle, an investigator in the robbery section of the Chicago Police Department, was called as the State's next witness. Officer Doyle testified that on December 6, 1974, at approximately 4 p.m., he and his partner, Dale Riordan, received a radio dispatch of shots being fired at 8822 South Stony Island Avenue. When they reached the intersection of 88th Street and Stony Island Avenue, Anthony Richardson and another male ran in front of their squad car. Richardson was limping badly from a bullet wound in his leg.

Officer Doyle directed these two men to follow him back to the lounge. As Doyle neared the lounge, he observed the defendant standing

on the driver's side of the Cadillac and he heard three shots fired. The Cadillac then pulled away. Officer Doyle ordered the defendant to drop his gun. The defendant did not respond. Officer Doyle repeated the command. Again the defendant did not respond. Finally, Doyle told the defendant if he did not drop the gun, he would be killed. The defendant placed the gun on the hood of a car.

In response to Officer Doyle's command, the defendant then dropped to his knees and put his hands behind his head. The defendant claimed several persons had robbed him. The police arrested the defendant and three other men who the defendant identified as the alleged robbers. At the station, the police found 14 live rounds of 32-caliber ammunition in the defendant's pocket.

Burt Nielson, a police officer in the firearms unit of the Chicago Police Department, testified that based on ballistic tests, in his opinion, the bullets and bullet jackets recovered in connection with the shooting of Robert O'Neal and Sharon Hawkins were fired from the defendant's gun.

The defense called as its first witness, Ernest Anderson, a disc jockey at the Playgirl Lounge. Anderson testified that on December 6, 1974, he arrived at the lounge at approximately 4:15 p.m. He noticed three men standing inside the door and a woman standing off to the side near the juke box. The defendant and Haynes were having a loud argument near the bar. Anderson asserted that Haynes had a gun in his right hand and some money in his left. When the defendant followed Haynes "and the persons that were with him" out of the lounge, Anderson heard gunfire.

On cross-examination, the State presented a transcript from the preliminary hearing held on February 27, 1975. At that hearing, Anderson testified: (1) that he never saw Haynes holding a gun; and (2) that there was "nothing" in Haynes' hands as he left the lounge.

David Pierce, the owner of the Chicken Shack, testified that on December 6, 1974, he was sitting in the Playgirl Lounge when a commotion occurred. Haynes directed profanity at the defendant and threatened to take his life. Haynes boasted he had a backup force outside and to prove it he walked out and came in with five or six persons. After directing some more threats at the defendant, Haynes left.

On cross-examination, Pierce testified that he did not see the barmaid hand any money either to Haynes or to anyone in his group. And the only gun he saw was the one the defendant held when he ran out of the lounge. Pierce stated that when Haynes and his group left the lounge someone said, "there's been a robbery." However, in a statement he gave to the police before trial, Pierce related that he did not hear anyone in the bar announce a robbery.

The defendant called Rutherford Wilson, a Chicago police officer, as his next witness. Officer Wilson testified that on December 6, 1974, he

received a radio dispatch that there was a man armed with a gun at 8820 South Stony Island Avenue. When Officer Wilson arrived on the scene, he was instructed to apprehend the occupants of a Cadillac that had just pulled away.

Officer Wilson drove up alongside the Cadillac, which was traveling "at a very slow rate of speed." He honked his horn but the driver did not respond. Officer Wilson then jumped out of his squad car and began running after the Cadillac. The Cadillac stopped two blocks from the lounge. Haynes exited the driver's door and "suddenly" turned in Officer Wilson's direction. Believing Haynes was armed, Officer Wilson fired one shot, wounding Haynes. No weapons were found on Haynes, in the Cadillac or in the vicinity around the Cadillac. The only money that was found was $5 in Haynes' pocket.

The defendant's wife, Betty Smith, testified that on December 6, 1974, at about 4:20 p.m., she called the lounge and talked to her husband. The defendant told her that a man was holding a gun on him and she should call the police. She did.

Vernon Myers, a patron of the Playgirl Lounge, testified that on December 6, 1974, he was sitting in the lounge having a drink when two men walked in. One of the men, using abusive language, asked the barmaid for Harvey's Bristol Creme. The barmaid said they did not have it. The man then asked for Tiller's Creme Sherry. At this point, the defendant told the barmaid she did not have to serve the two men.

Myers testified further that one of the men apparently drew a gun and told the defendant to hand over everything he had. The defendant instructed the barmaid to give the men the money from the cash register. The gunman grabbed the money the barmaid laid on the bar, and he and his partner backed out the front door of the lounge.

On cross-examination, Myers stated that when the defendant ran towards the front door after the two men, he ran out the back door. Despite the fact that Myers later saw the defendant placed under arrest, he never came forward to give a statement to the police. Myers "just went about [his] business."

Doretha Watts, a barmaid at the Playgirl Lounge, testified that Haynes and another man entered the lounge on December 6, 1974. Haynes directed profanity at the defendant and said he had his "boys" with him, his "brothers." Ms. Watts asserted that Haynes ordered her to give him "the money." Ms. Watts turned her back to the bar and took about $70 from the cash register. Without turning around again, she reached back and laid the money on the bar.

When Ms. Watts finally did turn around, the money was gone and Haynes was backing toward the front door. At this point, the phone rang. The defendant answered it and had a brief conversation. When he hung

up, the defendant asked Ms. Watts for his gun. She handed a revolver to him and placed a box of bullets on the bar. The defendant ran out the door and Ms. Watts heard several shots.

The defendant took the stand and testified that on December 6, 1974, Haynes and another man entered his lounge and directed abusive language toward the barmaid. The defendant told her not to serve them. Haynes then pulled a gun on the defendant and said, "I will burn this mother fucking place down. I will blow it up." Haynes also said he had seven or eight "brothers" with him.

"All of a sudden," five or six men entered the lounge along with two women. Defendant testified that one of these two women was Georgette Rosemoore. However, in a statement he gave to the police before trial, while the defendant did say "five brothers" came into the lounge, he made no mention of two women. Furthermore, in that same statement the defendant was asked, "Did you see any women with Haynes?" He answered, "No, I did not." Finally, when the defendant later signed out complaints against the alleged robbers, no women were named.

The defendant testified that one of the five "brothers" who entered the lounge was Robert O'Neal. O'Neal allegedly urged Haynes to shoot the defendant. At that point, the telephone rang. The defendant thought to himself, "Well, I am going to die, so I am going to die answering the phone." The defendant talked to his wife, informed her that there was a man in the lounge with a gun and told her to call the police. Haynes did not object to the defendant answering or talking on the phone.

After the defendant hung up, Haynes said, "I will take everything you've got." The defendant told the barmaid to give Haynes the money in the cash register. The barmaid threw some money on the bar. Haynes picked it up and he and his group backed out of the lounge.

When the last of the group had left, defendant ran around the bar and said to the barmaid, "Throw it to me baby." The barmaid "pitched" a chrome plated revolver to the defendant. Defendant denied that the barmaid also placed a box of bullets on the bar. The defendant "hit" the front door and began firing at the Cadillac. As he walked into the street, the Cadillac backed up and tried to run him over. The defendant fell to the street and found another revolver laying nearby. He picked it up and began firing again at the Cadillac.

Defendant denied shouting he would shoot everyone; denied pointing a gun at Veda Jefferson who was holding a baby in her arms; denied firing into the Cadillac; and denied that a man handed him the second gun.

The State called several witnesses in rebuttal. Officer John Sullivan testified that in a statement the defendant gave before trial he stated that a man had handed the second gun to him outside the lounge. Officer Dale

Riordan testified that as she ran toward the lounge on December 6, 1974, she saw the defendant walk around to the driver's side of the Cadillac and fire into the car. Officer Riordan also testified that in a statement the defendant gave before trial he mentioned that five men were involved in the alleged robbery. No women were ever mentioned.

Finally, Ruby Wales, a friend and past employee of the defendant, testified that on December 6, 1974, she was sitting in the Playgirl Lounge having a conversation with the defendant. She heard Haynes call the barmaid a bitch and then start arguing with the defendant. At this point, the phone rang and the defendant answered it. Ms. Wales got up from her seat and walked to the back of the lounge. When she returned, the defendant had hung up the phone.

The defendant told Ms. Wales he would probably have to kill Haynes. Ms. Wales said it made no sense to argue with Haynes and that if the defendant would keep quiet, Haynes might leave. The argument between the defendant and Haynes continued. Shortly thereafter, Ms. Wales got up and checked to make certain the back door was open. When she returned to her seat, Haynes said he would beat the defendant. At that time, four "dudes" entered the lounge. Ms. Wales testified that no women came in with these men. About three minutes later, Ms. Wales went out the back door, got in her car and left. Ms. Wales stated that at no time while she was in the lounge did she observe a gun or see a robbery take place.

During the trial, several defense witnesses testified to two prior altercations between the defendant and Haynes. We need not relate the details of these prior altercations except to note: (1) that at the second altercation, which took place only two days before the incident involved in this case, Haynes drew a gun and threatened to "blow the defendant's brains out"; and (2) that the defendant claimed he reported this second altercation with Haynes to the police. However, in a statement he gave before trial, the defendant admitted he did not report this altercation.

Finally, several witnesses were called to testify concerning a collateral issue. Ms. Rosemoore, the State's principal witness in this case, testified that on March 1, 1975, two days following the preliminary hearing, the defendant attempted to kill her. Rosemoore stated that at approximately 6 p.m. that day, she was standing in front of her apartment building located at 7825 South Stony Island Avenue, talking to Linda Richardson, when the defendant drove by and shot at her. Richardson took the stand and corroborated Rosemoore's story. Both Richardson and Rosemoore identified the defendant in court as the man who fired the shot.

The defense called several witnesses in an attempt to rebut this claim. Myrtle Gunn testified that on March 1, 1975, she left the Playgirl Lounge

at 4:30 p.m. and gave the defendant a ride home. After stopping at 95th Street and Racine Avenue, she dropped the defendant off at 71st Street and the Dan Ryan Expressway.

Rosemary Jones resided in the same apartment building as the defendant. Jones testified that on March 1, 1975, at about 6:15 p.m., the defendant came to her apartment with Lisa Jones, Jones' four-year-old daughter, and Loretta Smith, the defendant's daughter. The defendant informed Jones that her daughter, Lisa, had observed several young persons, including the defendant's own daughter, smoking marijuana on the stairway. Jones was then asked:

"Q. * * * [H]ow [are] you able to determine that this [incident occurred on] March the 1st, 1975 about 6:00 or 6:15 * * *? Was anything else unusual that took place on your home at that time?

A. No, not really,

Q. In regards to your husband, specifically?

A. * * * [W]ell, my husband was in the rear * * * bedroom watching * * * [a basketball] game * * *."

Defendant's daughter and wife substantially corroborated Jones' testimony.

The defendant testified that he arrived home on March 1, 1975, at about 5:30 p.m. He stated that he had been watching the Chicago Bulls basketball game when he caught his daughter smoking marijuana on the stairway in the presence of Jones' daughter. He brought both girls to Jones' apartment.

Linda Frost, a witness for the State and an employee of WSNS TV, testified that on March 1, 1975, the Chicago Bulls basketball game with the Detroit Pistons *started* at 7:30 p.m.

Following presentation of all the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of voluntary manslaughter. The trial court sentenced the defendant to a term of 2½ to 10 years imprisonment. Defendant appeals.

OPINION

Defendant's sole contention on appeal is that he was not proved guilty of voluntary manslaughter beyond a reasonable doubt because the evidence indicates he killed Sharon Hawkins and Robert O'Neal to prevent the commission of a robbery, a forcible felony. We disagree.

A person is justified in using deadly force if he reasonably believes it is necessary to thwart a robbery. (Ill. Rev. Stat. 1975, ch. 38, pars. 2—8, 7—3, 18—1.) Justifiable use of force to prevent the commission of an alleged robbery is an affirmative defense. (Ill. Rev. Stat. 1975, ch. 38, par. 7—14.) Once it is properly raised at trial (Ill. Rev. Stat. 1975, ch. 38, par. 3—2(a)), the State must prove the defendant guilty beyond a

reasonable doubt "as to that issue together with all the other elements of the offense" charged (Ill. Rev. Stat. 1975, ch. 38, par. 3—2(b)). See *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681.

■■ Based upon a detailed review of all the evidence, we conclude that the defendant was proved guilty of voluntary manslaughter beyond a reasonable doubt.

There is no dispute that the defendant shot and killed Robert O'Neal and Sharon Hawkins as they sat in a car outside the Playgirl Lounge. And the testimony of both Georgette Rosemoore and Ruby Wales, when taken together with the circumstantial evidence presented by the State, is sufficient to establish that a robbery did *not* occur, and that there was no legal justification for these killings.

While the defendant did present several witnesses to support his robbery claim, the testimony of a number of these witnesses was directly impeached by statements which they had earlier given to the police. The defendant's own testimony was impeached on four different occasions. Furthermore, David Pierce, a witness called by the defense, testified that he was in the lounge throughout the entire incident and he never saw Haynes with a gun and he never saw the barmaid hand Haynes or anyone in his group any money.

■■ It was the jury's function, as the trier of fact, to determine the credibility of the witnesses (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Beverly* (1977), 55 Ill. App. 3d 872, 371 N.E.2d 148), the weight to be given their testimony and the inferences to be drawn from the evidence (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733). As the evidence presented in this case is merely conflicting (*People v. Clark* (1964), 30 Ill. 2d 216, 195 N.E.2d 631), and not so improbable as to raise a reasonable doubt of guilt (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666), we will not substitute our judgment for that of the trier of fact.

Accordingly, for the reasons stated, we affirm the conviction of the defendant.

Affirmed.

JIGANTI, P. J., and ROMITI, J., concur.